**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

EDWARD REED,

                         Petitioner,

              v.                                         No. 15-CV-1169
                                                  (FJS/CFH)

HAROLD GRAHAM, Superintendent,
Auburn Correctional Facility,

                         Respondent.

_____

**CHRISTIAN F. HUMMEL
U.S. MAGISTRATE JUDGE**

**APPEARANCES:**                            **OF COUNSEL:**

EDWARD REED
07-A-0202
Petitioner pro se
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021

HON. ERIC T. SCHNEIDERMAN          PAUL B. LYONS, ESQ.
Attorney General for the                  Assistant Attorney General
   State of New York
120 Broadway
New York, New York 10271
Attorney for Respondent

## REPORT-RECOMMENDATION AND ORDER[1]

     Presently before this Court is a petition, filed by petitioner pro se Edward Reed

("petitioner"), seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. (Petition

("Pet.")) (Dkt. No. 1).  Petitioner brings this action, challenging a judgment of conviction

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

rendered on January 3, 2007, after a jury trial in Onondaga County Court. Petitioner was convicted of two counts of First Degree Burglary; two counts of Second Degree Criminal Possession of a Weapon; and Aggravated Assault of a Police Officer. People v. Reed, 115 A.D.3d 1334, 1335 (4th Dep't 2014). He was sentenced to a determinate sentence of fifty years incarceration with five years post-release supervision. Dkt. No. 12-1 at 25.[2]

The Appellate Division, Fourth Department, affirmed petitioner's conviction on March 28, 2014, but ordered that the aggregate maximum term of his sentence be adjusted to forty years in accordance with N.Y. PENAL LAW § 70.30(1)(e)(iv). Reed, 115 A.D.3d at 1337-38. The New York Court of Appeals denied leave to appeal on June 25, 2014.[3] People v. Reed, 23 N.Y.3d 1024 (2014).

Petitioner raises the following claims for this court's review:

    1.      The prosecution engaged in misconduct, which included failing to turn over Brady material and making incendiary comments to the jury during summation. (Pet. Grounds ("Grd.") 1, 3).

    2.      The trial court violated due process by refusing petitioner's request to instruct the jury that prosecution witness Allen Ellis be considered an accomplice as a matter of law. (Pet. Grd. 2).

    3.      One of the samples of petitioner's DNA relied on at trial was illegally obtained in violation of the Fourth Amendment. (Pet. Grd. 4).

    4.      Petitioner was denied the effective assistance of counsel

---

[2] Docket number 12 is the transcript of the State Court Record filed by respondent. All page references are to the pagination in the court's electronic filing system ("CM/ECF").

[3] This petition was signed and notarized on September 21, 2015. In its October 1, 2015 order, this Court noted that there was a potential statute of limitations issue. Dkt. No. 4, at 5. However, respondent did not raise any statute of limitations issue in his answer or memorandum of law. Dkt. Nos. 11, 13. Thus, the Court will assume that the petition is timely and will proceed with the appropriate analysis.

at trial. (Pet. Grd. 5).

Pet. at 8-13.  Respondent has filed a memorandum of law in opposition to the petition, together with the pertinent state court records.  Dkt. Nos. 12, 13.  Petitioner filed a traverse that included a request for appointment of counsel.  Dkt. No. 14.  For the following reasons, it is recommended that the petition be denied in its entirety.

## I.  Background

### A.  Relevant Facts

#### 1.  Burglary at 140 Thurber Street

On September 18, 2004, City of Syracuse police responded to a 911 call reporting a burglary-in-progress at 140 Thurber Street at approximately 1:30 a.m.  Dkt. No. 12-5 at 80. Officer Thomas Hahn was the first officer on the scene.  When he arrived, the front door to the apartment was open, but the outer screen door was shut.  Dkt. No. 12-7 at 54.  Through the screen door, Officer Hahn saw a male suspect "dressed in all black, black long sleeved [sic], black pants and he had a ski mask over his head."  Id. at 55.  This suspect was approximately five feet and ten inches tall, with a stocky build and big shoulders.  Id. at 59. A second suspect, described as thin and at least six feet and two inches tall, stood approximately ten feet away from the first and was similarly dressed.  Id. at 56.

Officer Hahn entered the apartment and noticed that the shorter suspect was holding a small silver handgun.  Dkt. No. 12-7 at 59.  Officer Hahn drew his service weapon, pointed it at the suspect, and issued several orders to drop the gun.  Id. at 60.  After initially ignoring the order, the shorter suspect sat on a nearby couch, and tucked his gun into the couch cushions.  Id. at 61.  He then stood up and moved quickly to the back of the apartment, where the taller suspect was attempting to open a sliding glass door and escape.  Id. at 61, 63-64.  With his gun still drawn, Officer Hahn grabbed the shorter suspect by the shoulder.

Id. at 64.  The suspect grabbed hold of Hahn's gun hand.  Id. at 64-65.  During this struggle, officer Hahn's gun discharged, and the magazine fell out.  Id. at 66-67.

Officer Hahn testified that he remembered seeing the taller suspect coming toward him, but had no other memory until he "came to" on his hands and knees on the apartment floor.  Dkt. No. 12-7 at 59.  He was alone in the apartment, and realized that he had lost his gun.  Id.  He had suffered a skull fracture in his struggle with the suspects and was initially unable to radio for assistance because his injuries impaired his speech and ability to move.  Dkt No. 12-6 at 371-75; Dkt. No. 12-7 at 68-69.

Other police officers arrived at the scene shortly after Officer Hahn was attacked, and they observed the two suspects running from the apartment.  Dkt. No. 12-5 at 106.  A foot pursuit of the suspects was unsuccessful.  Id. at 113-18.  While the search for the suspects continued, one of the officers attended to Officer Hahn's injuries until an ambulance arrived.  Id. at 82-83.  After the crime scene was secured, the Syracuse police recovered Officer Hahn's service weapon outside the apartment.  Dkt. No. 12-6 at 145.  It was loaded, with the hammer cocked,  and a spent shell casing was  lodged in one of the chambers, making the gun inoperable.  Id. at 290-91.  The police also recovered a silver handgun from the apartment couch, another gun hidden in a trash can, a black mask, and a Chicago White Sox baseball cap.  Id. at 107, 336-42.  The police also collected fingerprints and footprint impressions from inside the apartment.  Id. at 209.  Fingerprint analysis was inconclusive, but the footprint impressions were consistent with the sole of a men's Nike Air Force One sneaker.  Id. at 207.

Syracuse police learned that the burglarized apartment was rented by Duane Baxter, a known drug dealer.  Dkt. No. 12-5 at 232.  The police theorized that the apartment was targeted as a likely source of cash and drugs, but were unable to identify the suspects.  Then, in September 2005, two cooperating defendants in an unrelated federal drug and

gang crackdown implicated petitioner, Edward Reed, and another man, Matthew Freeman, during plea negotiations related to the federal charges. Dkt. No. 12-6 at 14-27, 55-57. Based on these leads, Syracuse police conducted surveillance on petitioner's residence in November 2005, and observed petitioner smoking in his driveway. Id. at 461. Before going back into his house, petitioner discarded the cigarette butt in his driveway, and spit several times on the ground. Id. at 466. After plaintiff left the property, Syracuse police entered the driveway and collected the cigarette butt and saliva for a DNA comparison. Id. at 468. Ultimately, lab analysis showed that petitioner's DNA matched the most prevalent DNA sample that was taken from the Chicago White Sox hat found at the crime scene. Id. at 241-42.

## 2. Trial and Related Proceedings

On or about June 29, 2006, petitioner and co-defendant Freeman were indicted for Attempted Murder in the First Degree, Aggravated Assault upon a Police Officer, two counts of Burglary in the First Degree, and two counts of Criminal Possession of a Weapon in the Second Degree. Dkt. No. 12-1 at 18. Their jury trial[4] before Onondaga County Court Judge William D. Walsh commenced on October 10, 2006. Id. at 23.

The prosecution introduced several police witnesses, including Officer Hahn, who described their observations of the suspects and the subsequent investigation. Dkt. No. 12-5. at 46-47. Although none of the officers had a clear look at the suspects' faces, the prosecution contended that the 5'10" petitioner was the shorter suspect who first assaulted Officer Hahn, and Freeman, who was 6'6", was the taller suspect based on the officers' description of their height, physique, and skin tone. Id. at 46-47.

The prosecutor supported this theory with the testimony of Sheila Gentile, a senior

---

[4] Petitioner's severance motion was denied on August 30, 2006. Dkt. No. 12-4 at 29.

scientist for the Forensic Biology DNA section of the Center for Forensic Science. Dkt. No. 12-6, at 222-70. She had compared the DNA samples taken from the Chicago White Sox cap found at the crime scene with two samples of petitioner's DNA—one obtained from the material collected from petitioner's driveway and a separate sample from a court-ordered swab of petitioner's cheek. Id. at 242. Gentile testified that petitioner's DNA was a match for DNA found on the cap. Id. at 242-45. She also testified that two other unknown individuals' DNA was found on the hat, in much smaller amounts. Id. at 247-48.

The prosecution also relied on the testimony of the two cooperating witnesses, who implicated petitioner and Freeman during their plea negotiations in the federal case. Dkt. No. 12-5 at 252-317; Dkt. No. 12-6 at 28-99. Both witnesses described their contacts with the defendants prior to the burglary. Ronnie Parnell, a crack cocaine dealer who described himself as an "associate" of both defendants, testified that he was present in September 2004 when Freeman told petitioner that "[h]e had a jux"[5] for petitioner to do, and petitioner "said all right." Dkt. No. 12-6 at 34, 36. Parnell also testified that he heard petitioner tell Freeman that "he didn't have a ratchet,"[6] and Freeman responded that he would take care of it. Id. at 35. Parnell testified that another man, Allen Ellis, arrived a short time later and delivered a handgun to Freeman. Id. at 36. During his own testimony, Ellis confirmed that he had loaned a gun to Freeman. Dkt. No. 12-5 at 262. He testified that Freeman told him that the gun was needed for a "hit," which Ellis interpreted as either a shooting or a robbery. Id. at 259.

Both cooperating witnesses testified that they also had contact with the defendants after the burglary and assault on Officer Hahn. Parnell testified that he was at the house of a common associate, Glenn Pendergraph, in the early morning hours of September 18,

---

[5] Parnell testified that "jux" was slang for a robbery. Dkt. No. 12-6 at 34.

[6] Parnell testified that "ratchet" was slang for a gun. Dkt. No. 12-5 at 35.

2004. Dkt. No. 12-6 at 41-43. Pendergraph was "cooking" powder cocaine into the more lucrative crack cocaine when he received a phone call from petitioner, who was in need of a ride. Id. at 44. Parnell testified that he volunteered to pick up petitioner, so that Pendergraph would not be interrupted. Id. at 44-45. According to Parnell's testimony, petitioner requested to be picked up behind a liquor store near Thurber Avenue. Id. at 47. As Parnell approached the area, he saw a heavy police presence. Id. at 49. As he was driving, Parnell received another call from petitioner, directing him to pull over to the side of the road. Id. at 50. Parnell testified that petitioner emerged from some bushes while wearing a rain-soaked t-shirt. Id. at 54. He told Parnell that "something went down, [petitioner] had to jump on the police." Id. at 54-55. Parnell drove petitioner to Pendergraph's house without asking any questions. Once there, Parnell observed petitioner make several phone calls in an unsuccessful effort to contact Freeman. Id. at 54-55.

Cooperating witness Ellis described separate contacts with both petitioner and Freeman. According to Ellis' testimony, Freeman met him several days after the burglary, and told him that he had lost Ellis's gun. Dkt. No. 12-5 at 273. Freeman agreed to pay Ellis six hundred dollars as compensation. Id. at 274. Ellis also testified that he was jailed with petitioner in March or April 2006. Id. at 277. While there, petitioner asked Ellis if he would "go to trial for him," presumably to testify on his behalf in connection with the attempted murder, burglary, and assault charges. Id.

Petitioner presented one witness in his defense. His wife, Wilisha Reed, testified that she had dinner with her husband at her mother's house on the evening of September 17, 2004, and was with him that night except for a two hour period between 6 p.m. and 8 p.m. Dkt. No. 12-7 at 187-89. She testified that she drove home with her husband at approximately 11:30 p.m., and that they were in bed by approximately 12:30 a.m. or 1 a.m.

Id. at 190.  Ms. Reed also testified that her husband owned forty-eight baseball caps, including a black Chicago White Sox cap like the one found at the crime scene.  Id. at 194-95.  She testified that he often loaned caps to friends, and that she did not remember the last time that she saw that particular cap.  Id. at 204-206.

The jury acquitted both defendants of attempted murder, but found them guilty on all other charges: Aggravated Assault upon a Police Officer; two counts of First Degree Burglary; and two counts of Second Degree Criminal Possession of a Weapon. Dkt. No. 12-8 at 89.


## II.  Analysis[7]

### A.  Request for Appointment of Counsel

In his traverse, petitioner states that he "does not have sufficient knowledge" to address respondent's assertions and requests appointment of legal counsel.  Dkt. No. 14 ¶ 1.  This Court denies petitioner's motion for appointment of counsel.

"There is no constitutional right to representation by counsel in habeas corpus proceedings."  United States v. Yousef, 395 F.3d 76, 77 (2d Cir. 2005) (per curiam); see also Pennsylvania v. Finley, 481 U.S. 551, 555 (1987) ("[T]he right to appointed counsel extends to the first appeal of right, and no further").  A court may, in its discretion, appoint counsel for "any financially eligible person" where "the interests of justice so require[.]"  18 U.S.C. §3006A(a)(2)(B).  In determining whether to appoint counsel, a habeas court should "consider the petitioner's likelihood of success on the merits of his petition, the complexity of legal issues raised by such application and the petitioner's ability to investigate and present his case to the federal habeas court."  Soto v. Walker, No. 9:00-CV-0197 (TJM/DEP), 2005

---

[7]  All unpublished opinions cited to by the Court in this Report-Recommendation and Order are, unless otherwise noted, attached to this Report-Recommendation and Order.

WL 2260340, at *4 (N.D.N.Y. Sept. 15, 2005); see Hodge v. Police Officers, 802 F.2d 58, 60-61 (2d Cir. 1986).  When a petitioner's claims may "fairly be heard on written submissions," a habeas petitioner's request for counsel should ordinarily be denied. Reynolds v. Greene, No. 9:05-CV-1539 (DNH), 2010 WL 604179, at *2 (N.D.N.Y. Feb. 16, 2010) (quoting Brito v. Burge, No. 1:04-CV-0432, 2005 WL 1837954, at *1 (S.D.N.Y. Aug. 3, 2005)).

This Court finds that petitioner's claims may be heard on the written submissions. Petitioner has not stated any "special reason" why appointing counsel to assist him is warranted.  Hodge, 802 F.2d at 62.  He also has not demonstrated that his claims are overly complex, or that "appointment of counsel would be more likely to lead to a just determination."  Brito, 2005 WL 1837954, at *2 (citing Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1341 (2d Cir. 1994)).  Accordingly, petitioner's motion for appointment of counsel is denied.

## B.  The AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that, when a state court has adjudicated the merits of a petitioner's claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  See also, e.g., Noble v. Kelly, 246 F.3d 93, 98 (2d Cir. 2001); Brown v. Alexander, 543 F.3d 94,

100 (2d Cir. 2008).[8]  This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt."  Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted).

Under section 2254(d)(1), a state-court decision is contrary to clearly established Supreme Court precedent if its "conclusion on a question of law is 'opposite' to that of the Supreme Court or if the state court decides a case differently than the Supreme Court's decision 'on a set of materially indistinguishable facts.'"  Id. (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)).  A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle, but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case.  See Williams, 529 U.S. at 413; Ramdass v. Angelone, 530 U.S. 156, 166 (2000).

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e) (1).  If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed de novo.  Washington v. Shriver, 255 F.3d 45, 55 (2d Cir. 2001).


## C.  Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  Baldwin v. Reese, 541 U.S. 27, 29

---

[8]  Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact.  Thompson v. Keohane, 516 U.S. 99, 107-113 (1995).  When presented with these questions, the court was empowered to conduct an independent review of the record.  Id.

(2004) (citing <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995) (internal quotation and other citations omitted)); 28 U.S.C. § 2254(b)(1).  The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim.  <u>Id.</u>; <u>Bossett v. Walker</u>, 41 F.3d 825, 828 (2d Cir. 1994).

"A habeas petitioner has a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.'" <u>Hernandez v. Conway</u>, 485 F. Supp. 2d 266, 273 (W.D.N.Y. 2007) (quoting <u>Daye v. Attorney General</u>, 696 F.2d 186, 194 (2d Cir.1982)).


### D.  Procedural Bar

A federal judge may not issue a writ of habeas corpus if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim.  <u>See</u> <u>Wainwright v. Sykes</u>, 433 U.S. 72, 81-85 (1977).  A federal habeas court generally will not consider a federal issue if the last state court decision to address the issue "'rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" <u>Garvey v. Duncan</u>, 485 F.3d 709, 713 (2d Cir. 2007) (quoting <u>Lee v. Kemna</u>, 534 U.S. 362, 375 (2002)) (emphasis added).  This rule applies whether the independent state law ground is substantive or procedural.  <u>Id.</u>

There are certain situations in which the state law ground will not be considered "adequate":  (1) where failure to consider a prisoner's claims will result in a "fundamental

miscarriage of justice," <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991); (2) where the state procedural rule was not "'firmly established and regularly followed,'" <u>Ford v. Georgia</u>, 498 U.S. 411, 423-24 (1991); <u>James v. Kentucky</u>, 466 U.S. 341, 348-349 (1984); and (3) where the prisoner had "cause" for not following the state procedural rule and was "prejudice[d]" by not having done so. <u>Wainwright</u>, 433 U.S. at 87. In <u>Garvey v. Duncan</u>, the Second Circuit stated that, in certain limited circumstances, even firmly established and regularly followed rules will not prevent federal habeas review if the application of that rule in a particular case would be considered "exorbitant." <u>Garvey</u>, 485 F.3d at 713-14 (quoting <u>Lee</u>, 534 U.S. at 376).

A state prisoner who has procedurally defaulted on a federal claim in state court may only obtain federal habeas review of that claim if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that he is "actually innocent." <u>Clark v. Perez</u>, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations omitted). "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the alleged constitutional violation. <u>Stickler v. Greene</u>, 527 U.S. 263, 289 (1999).

To demonstrate "actual innocence," a habeas petitioner must show that it is more likely than not that no reasonable juror would have convicted him, but for the alleged constitutional violation. <u>Murden v. Artuz</u>, 497 F.3d 178, 194 (2d Cir. 2007), <u>cert. denied sub nom.</u> <u>Murden v. Ercole</u>, 552 U.S. 1150 (2008); <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995). "Actual innocence" requires factual innocence, not "legal" innocence. <u>Murden</u>, 497 F.3d at 194. A claim of actual innocence requires petitioner to put forth new, reliable

evidence that was not presented at trial.  Cabezudo v. Fischer, 05-CV-3168, 2009 WL 4723743, at *13 (E.D.N.Y. Dec. 1, 2009) (citing Lucidore v. N.Y.S. Div. of Parole, 209 F.3d 107, 114 (2d Cir. 2000)); Schlup, 513 U.S. at 316, 327-328.

## E.  Prosecutorial Misconduct

### 1.  Legal Standard

A prosecutor has the duty under Brady v. Maryland, 373 U.S. 89 (1963) to produce evidence favorable to the defense.  To prevail on a Brady claim, petitioner must show that the prosecution suppressed evidence favorable to him and that the evidence was material either to guilt or punishment.  Brady, 373 U.S. at 87.  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Payne, 63 F.3d 1200, 1209 (2d Cir. 1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case.  Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987).

If defense counsel knew or should have known of essential facts permitting him to take advantage of exculpatory evidence, then the evidence is not considered withheld for Brady purposes.  United States v. Zackson, 6 F.3d 911, 918 (2d Cir. 1995).  Disclosure of impeachment evidence is also required under Brady.  Bagley, 473 U.S. at 676.  Evidence relevant to impeachment is material if the "witness whose testimony is attacked supplied the only evidence linking [the defendant] to the crime, or where the likely impact on the witness's credibility would have undermined a critical element in the prosecution's case." United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996).  When the issue is late disclosure of Brady material, a new trial is required only when the defendant was deprived of a meaningful opportunity to use the material.  Freeman v. Kuhlman, No. 96 CV 3749, 1998

-13-

WL 661469, at *3 (E.D.N.Y. Aug. 3, 1998) (citing <u>People v. Cortijo</u>, 70 N.Y.2d 868, 870, 523 N.Y.S.2d 464, 464 (1987)).

### 2. Alleged <u>Brady</u> Violation

Petitioner argues that the prosecutor failed to turn over copies of police reports that raised questions about the credibility of Allen Ellis, one of the cooperating witnesses who implicated petitioner in the burglary and assault on Officer Hahn. During a June 2005 investigation of a shooting at a house where Ellis had stayed, the police investigated rumors that the shooting was retaliation for Ellis's robbery of rival drug dealers. Dkt. No. 12-2, at 36-40. One individual interviewed by police stated that Ellis was "constantly doing drug rip offs." <u>Id.</u> at 38. The information came to light after the verdict, when co-defendant Freeman's counsel was reviewing material in connection with an unrelated federal proceeding. Dkt. No. 12-8, at 107. At trial, petitioner's counsel had contended that Ellis may have actually committed the burglary and assaulted Officer Hahn, due to his criminal history and similar physical description. Dkt. No. 12-7 at 277. Petitioner argues that the prosecution's withholding of evidence of Ellis's suspected involvement in similar crimes impaired his counsel's ability to impeach Ellis' credibility.

Petitioner raised this argument in his direct appeal. The Appellate Division, Fourth Judicial Department, found that

> [e]ven assuming, arguendo, that the reports were required to be turned over notwithstanding the fact that the witness did not commit the crime and indeed that the crime was directed toward that witness in retaliation for another incident, and further assuming, arguendo, that the information was possessed by the prosecution and not by the defense, we conclude that reversal is not warranted.

<u>People v. Reed</u>, 115 A.D.3d 1334, 1335 (4th Dep't 2014). The appellate court noted that Ellis had been

> heavily cross-examined at trial concerning his numerous convictions, the serious new charges still pending against him, his failure to come forward with information concerning this defendant until after the witness was arrested on those new charges, and the benefit that he received with respect to those charges in return for testifying against this defendant.

Id. Therefore, the appellate court found that there was no reasonable probability that additional cross-examination of that witness concerning "one more charge" would have yielded a different result.[9]

The Appellate Division's finding that any failure to disclose the police reports did not violate Brady was not contrary to, or an unreasonable application of, Supreme Court precedent. See Bagley, 473 U.S. at 681-82 (even if suppressed documents are exculpatory, there is no constitutional violation unless "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); United States v. Spinelli, 551 F.3d 159, 164-65 (2d Cir. 2008) (impeachment material is less likely to be material when it "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable"). Accordingly, this court recommends that petitioner's Brady claim be denied.

### 3. Remarks During Summation

A claim of prosecutorial misconduct warrants habeas corpus relief only where the prosecutor's remarks so infected the trial with unfairness that the resulting conviction is a denial of due process. Darden v. Wainwright, 477 U.S. 168, 181 (1986). The habeas court must distinguish between "'ordinary trial error of a prosecutor and that sort of

---

[9] The Appellate Division misstated the record when it described the additional information as "one more charge." Ellis, whose arrest records had been turned over to the defendants, was apparently never charged or arrested in connection with these allegations. Despite this error, the Appellate Division correctly applied Bagley.

egregious misconduct . . . amounting to a denial of constitutional due process.'" Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir.1990) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)). In order to show a constitutional violation, the petitioner must demonstrate that he suffered substantial prejudice from the prosecutor's remarks. Bradley v. Meachum, 918 F.2d 338, 343 (2d Cir. 1990). Three factors are considered in determining whether a prosecutor's summation created "substantial prejudice": the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements. Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir.1998).

### a. Procedurally Defaulted Claims

The failure to object at trial when required is an independent and adequate state law ground for denial of a claim. Simpson v. Portuondo, No. 01 Civ. 1379, 2001 WL 830946, at *12 & n.39 (S.D.N.Y. July 12, 2001) (citing inter alia N.Y. CRIM. PROC. LAW § 470.05(2)). In Simpson, the court found that under New York law, petitioner was required to raise his challenges to the prosecutor's alleged errors in summation by way of specific objections, and if those objections were sustained, was required to seek further relief. Id. at *11 & n.38 (citing inter alia People v. Tardbania, 72 N.Y.2d 852, 853 (1988); People v. Dordal, 55 N.Y.2d 954, 956 (1982); People v. Medina, 53 N.Y.2d 951, 953 (1981)). In a footnote, the court cited People v. Merchan, 150 A.D.2d 730, 731 (2d Dep't), lv. denied, 74 N.Y.2d 815 (1989), in which the court held petitioner waived consideration of the prosecutorial misconduct claim where most of the improper remarks were not objected to, and when the intermittent objections were sustained, no further relief, curative instructions, or mistrial were requested so the court was deemed to have corrected the error to the defendant's satisfaction.

The Appellate Division held that certain of petitioner's challenges to the

prosecutor's summation remarks had not been preserved for appellate review due to the lack of a contemporaneous objection at trial. Reed, 115 A.D.3d at 1338 (citing N.Y. CRIM. PROC. LAW § 470.05(2)). Specifically, the Appellate Division refused to consider the claims in petitioner's pro se supplemental brief that the prosecutor had vouched for the credibility of witnesses Ronnie Parnell and Allen Ellis, and that the prosecutor's summation included inflammatory comments that extolled Officer Hahn's heroism and humanity, labeled the defendants as "bad guys," and suggested that Officer Hahn would have been justified in shooting the defendants. Dkt. No. 12-3, at 126-28. Based upon the New York law cited above, it is clear that the procedural default cited by the Appellate Division in this case is both firmly established and regularly followed. Petitioner, who has alleged ineffective assistance of counsel at trial in other respects, has not done so with regard to the lack of objections during summation. Therefore, petitioner has not alleged cause or prejudice, or that a fundamental miscarriage of justice would result if these claims are not addressed. Accordingly, the two corresponding prosecutorial misconduct claims raised in the federal petition are barred from habeas review. Coleman, 501 U.S. at 749-50.

### b. Claims Dismissed on the Merits

The Appellate Division found that the prosecutorial misconduct claims that had been preserved for review "were not so pervasive or egregious as to deprive defendant of a fair trial" and that "none warrant reversal or modification of the judgment." Reed, 115 A.D.3d at 1337. Based upon a review of plaintiff's arguments, this court finds that the Appellate Division's findings were neither contrary to, nor an unreasonable application of clearly established Supreme Court precedent as further explained below. Accordingly, the undersigned recommends that petitioner's prosecutorial misconduct claims be denied.

### i. Alleged Invocation of Religion

During his discussion of Ronnie Parnell's testimony, the prosecutor noted that Parnell accused petitioner and Freeman of committing the burglary and assault on Officer Hahn prior to the DNA match that tied petitioner to the crime scene. Dkt. No. 12-7, at 290. In response to defense counsel's challenges to Parnell's credibility, the prosecutor asked a rhetorical question: "How in God's name does Ronnie Parnell know" at the time of his debriefing that the police would eventually find a DNA match to independently verify the information that Parnell provided them?

Petitioner argues that this singular reference to God improperly injected religion into the jury's deliberative process.[10] Petitioner does not explain how the prosecutor's one colloquial reference to "God," even if interpreted by the jury as an invocation of religion, was so prejudicial as to deprive him of a fair trial. See Mastowski v. Superintendent, No. 10-CV-445T, 2011 WL 4955029, *13 (W.D.N.Y. Oct. 18, 2011) (denying habeas relief where prosecutor thanked God for victim's recovery). Accordingly, this Court cannot conclude that the state court's adjudication of this claim contravened or unreasonably applied settled Supreme Court precedent.

### ii. Alleged Vouching for His Version of Events

Petitioner further contends that the prosecutor inappropriately vouched for his version of events, telling the jury, ". . . I've connected it all. I told you I'm going to make it all fit and it does." Defense counsel objected to this remark, and the trial court sustained the objection. Dkt. No. 12-7, at 298. In addition, the trial court had already instructed the jury that "if during summation I sustain an objection to a comment of the lawyer that comment is stricken from the record and you must disregard that comment as if it were

---

[10] The trial record does not show that petitioner objected to this remark during summation, but the Appellate Court addressed the issue on the merits, and did not raise any preservation concerns.

never said." Id. at 231.

Jurors are presumed to follow a court's instructions. See CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841 (2009). The trial court's sustaining of petitioner's contemporaneous objection and the related jury instruction thus shielded petitioner from any prejudicial effect that could have stemmed from the complained-of comment made by the prosecutor.


### iii.  Accusation that Defense Witnesses Lied

Petitioner also argues that the prosecutor inflamed the jury by stating, in regard to co-defendant Freeman's defense witnesses, ". . . they both came in and lied to you. They were inconsistent with whether [Freeman] had a cold or whether it was his diabetes. I think I established ladies and gentlemen, that those two were not telling the truth." Freeman's counsel objected to this characterization but was overruled. Dkt. No. 12-7 at 299-300.

The prosecutor's assertion that Freeman's alibi witnesses lied to protect him arguably falls within a prosecutor's broad latitude during summation. See United States v. Clark, 593 F. App'x 53, 55 (2d Cir. 2014); see also United States v. Peterson, 808 F.2d 969, 977 (2d Cir.1987) (noting that "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory"). In addition, the trial court instructed the jury prior to summations that their individual evaluation of the truth and accuracy of the evidence presented controlled over any interpretation suggested by the attorneys. Dkt. No. 12-7 at 231. Again, the trial court's jury instructions reduced whatever minimal prejudice may have resulted to petitioner from the prosecutor's characterization of his co-defendant's alibi witnesses.

### iv. Reference to Matters Outside the Record

Petitioner also argues that the prosecutor improperly went outside the trial evidence when discussing Officer Hahn's inoperable service weapon, which was found outside the apartment. The prosecutor theorized during his summation that "[petitioner] or Matthew Freeman picked that gun up, probably pressed the trigger, nothing happened." Dkt. No. 12-7, at 304. Petitioner correctly points out that there was no evidence that either suspect attempted to fire Officer Hahn's gun.

Still, this court finds that no prejudice resulted from the prosecutor's theory, which he offered to show an "intent to kill" in support of the attempted murder charge against both defendants. Dkt. No. 12-7 at 305. As noted previously, the prosecution has broad latitude in framing its arguments for the jury, and the trial court had instructed the jury to disregard any factual assertions by legal counsel that were not based on the evidence. See Clark, 593 F. App'x at 55. Moreover, the jury acquitted both defendants of the attempted murder charge. See Acevedo v. Henderson, No. 86 C 3380, 1987 WL 30235, at *5 (E.D.N.Y. Dec. 7, 1987) (finding no prejudice where the petitioner was ultimately acquitted of the charge to which the improperly admitted statement pertained).

### F. Accomplice Charge

#### 1. Legal Standard

Section 2254 provides that an application for writ of habeas corpus will be entertained on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims that are rooted in alleged errors of state law are not cognizable in a federal habeas corpus action. See Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (habeas statute "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the

United States"); Estelle v. McGuire, 502 U.S. 62, 67 (1991) (federal habeas relief does not lie for errors of state law).

## 2. Application

Petitioner argues that Ellis, who admitted to providing a gun to the defendants, was an accomplice as a matter of law whose testimony required corroboration.  Pet. at 8-9.  He asserts that the trial court's failure to so instruct the jury resulted in an unfair trial. Id.

Under federal law, an accomplice's testimony need not be corroborated to establish guilt.  United States v. Elusma, 849 F.2d 76, 79 (2d Cir. 1988).  Thus, any claim that the evidence in this case was insufficient because the accomplice's testimony was not properly corroborated is not cognizable in a federal habeas corpus petition.  See Rivera v. Artus, No. 08-CV-1782, 2010 WL 7506091, at *3 (E.D.N.Y. July 20, 2010) (holding that an accomplice corroboration claim not cognizable in federal habeas corpus action); Arrington v. Bradt, No. 9:08-CV–70, 2009 WL 909841, at *9 (N.D.N.Y. Apr. 2, 2009).  Accordingly, this Court recommends that this claim be denied.

## G.  Unlawful Search and Seizure of DNA Evidence

### 1.  Legal Standard

In Stone v. Powell, 428 U.S. 465 (1976), the Supreme Court held that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a petitioner may not challenge an allegedly unconstitutional search and seizure in an application for federal habeas relief.  Id. at 481–82; see also Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).  The Second Circuit has determined that review of a Fourth Amendment claim in a habeas corpus application is proper only if: (1) the state has provided no corrective procedures at all to redress the alleged Fourth Amendment

violations; or (2) the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in that process. See Capellan, 975 F.2d at 70; Gates v. Henderson, 568 F.2d 830, 839–40 (2d Cir. 1977). New York provides an approved mechanism for litigating Fourth Amendment claims. See Capellan, 975 F.2d at 70 (citing N.Y. CRIM. PROC. LAW § 710.10 et seq.).

## 2. Application

Petitioner argues that the collection of a cigarette butt and saliva from his driveway by the Syracuse Police constituted an illegal search in violation of the Fourth Amendment. The trial record shows that plaintiff's counsel initially moved to suppress this evidence, but elected to withdraw that motion as "moot" in light of the court's order that petitioner provide a DNA sample after his indictment. Dkt. No. 12-4, at 50-51. Accordingly, petitioner had an opportunity to utilize the approved state law mechanism for litigating his Fourth Amendment claims regarding the DNA evidence, but elected not to pursue it. Petitioner has not alleged any facts that would demonstrate an unconscionable breakdown of the process, and the record demonstrates that petitioner's voluntarily withdrawal of the suppression motion was based on strategic and practical considerations.[11] Based upon Stone, petitioner cannot challenge the legality of the DNA collection in this proceeding, and this court recommends that his Fourth Amendment claim be denied.

## H. Ineffective Counsel

### 1. Legal Standard

The general standard for ineffective assistance of counsel was articulated by the

---

[11] The Appellate Division held that it was "clear" that a motion to suppress the driveway DNA evidence "was subject to denial on several grounds. . ." Reed, 115 A.D.3d at 1337.

Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 687-696 (1984).  This test requires an affirmative showing that counsel's performance fell below an objective standard of reasonableness, and that prejudice resulted because there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  <u>Id.</u> at 688, 694.  An ineffective-assistance claim "must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." <u>Bennett v. United States</u>, 663 F.3d 71, 85 (2d Cir. 2011) (citing <u>Strickland</u>, 466 U.S. at 697).

When assessing counsel's performance, courts "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" <u>Jackson v. Leonardo</u>, 162 F.3d 81, 85 (2d Cir. 1998) (quoting <u>Strickland</u>, 466 U.S. at 689).  Courts should not use hindsight to second-guess sound tactical decisions made by attorneys.  <u>McKee v. United States</u>, 167 F.3d 103, 106 (2d Cir. 1999) (citing <u>Strickland</u>, 466 U.S. at 689).

In evaluating the prejudice component of <u>Strickland</u>, a "reasonable probability" that the outcome of the proceeding would have been different means "a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u>, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable."  <u>Santone v. Fischer</u>, 689 F.3d 138, 155 (2d Cir. 2012) (citing <u>Strickland</u>, 466 U.S. at 693).  Unlike the performance determination, the prejudice analysis may be made with the benefit of hindsight.  <u>McKee v. United States</u>, 167 F.3d at 106-107 (citing, <u>inter alia</u>, <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993)).

The "AEDPA requires the federal habeas court to accord deference to the state court's ruling on claims of ineffective assistance of counsel."  <u>Santone</u>, 689 F.3d at 154.  As the Supreme Court stated in <u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011):

The standards created by <u>Strickland</u> and § 2254(d) are both

> "highly deferential," . . . and when the two apply in tandem, review is "doubly" so. . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

(citations omitted).

## 2. Application

### a. Exhausted Claims

The Appellate Division denied certain of petitioner's ineffective assistance of counsel claims on their merits: (1) counsel's failure to challenge a juror who admitted to having previously met one of the police officers who testified at trial; (2) counsel's failure to object to the testimony of prosecution expert Sheila Gentile, whose reference to a DNA database of convicted felons could lead the jury to believe that petitioner was in that database; (3) counsel's withdrawal of his motion to suppress the DNA evidence that was obtained from petitioner's driveway; and (4) counsel's failure to object to the trial court's <u>Sandoval</u> ruling that certain of petitioner's misdemeanor convictions, and the general fact that petitioner was convicted of a felony, could be introduced at trial.[12] For each of these claims, the court found that petitioner "had failed to show the absence of a strategic explanation for defense counsel's alleged failures." <u>Reed</u>, 115 A.D.3d at 1337 (citations omitted).

The Appellate Division in this case did not unreasonably apply <u>Strickland</u> in determining that petitioner failed to show that counsel's decisions were not strategic. As stated above, courts presume that counsel's conduct falls within the wide range of reasonable professional assistance and will not second-guess sound tactical decisions made by attorneys. <u>See</u> <u>Harrington</u>, 562 U.S. at 109 ("Although courts may not indulge

---

[12] The trial court ruled that the prosecutor could not discuss the nature of this felony (felony gun possession), or inquire into a youthful offender adjudication. Dkt. No. 12-4, at 63.

"post hoc rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect.'") (internal citations omitted).

The record supports the appellate court's conclusion. When Juror No. 7 notified the court that he knew one of the police officers who testified for the prosecution, the trial judge promptly questioned him with all counsel present. Dkt. No. 12-7, at 76-77. The juror informed the court that he did not know the police officer well, and had last seen him years ago.[13] Id. at 76. The juror stated that he could still fairly assess the officer's credibility. Id. Therefore, the Appellate Division could reasonably conclude that petitioner's counsel made a tactical determination that this juror was still acceptable to the defense. McCullough v. Bennett, 143 F. App'x 379, 380-81 (2d Cir. 2005) (denying ineffective assistance claim when attorney did not move to strike juror whose answers in voir dire raised questions about his impartiality). Petitioner has offered no basis to question that conclusion.

Likewise, petitioner has offered no rebuttal to the presumption that counsel had a strategic basis for not objecting to Gentile's reference to the DNA database. See, e.g., Bierenbaum v. Graham, 607 F.3d 36, 57-58 (2d Cir. 2010) (counsel made reasonable strategic decision not to object in order to avoid highlighting issue for the jury). Petitioner's counsel also placed his strategic considerations on the record when he chose to withdraw his suppression motion as to the DNA evidence collected from petitioner's driveway ("The court had signed an order for DNA testing, and there was probable cause on the statement of Ronnie Parnell. So I'm more than willing to waive that hearing. It

---

[13] The police officer, Mark Kleist, was the second-to-last prosecution witness. He testified that he was part of the original investigation of the burglary and assault and had debriefed Ronnie Parnell after he implicated petitioner and Matthew Freeman. Dkt. No. 12-7, at 16-47.

appears now that it's moot.") and to accept the court's <u>Sandoval</u> ruling ("I think the court has pretty well split the baby relative to Sandoval, so that's fine with us."). Dkt. No. 12-4, at 50-51, 63.

Accordingly, the Court recommends that petitioner's exhausted ineffective assistance of counsel claims be denied.

### b. Unexhausted Claims

The Appellate Division did not consider petitioner's remaining ineffective assistance of counsel claims, because those claims "involve matters outside the record on appeal, and thus the proper procedural vehicle for raising [those contentions] is by way of a motion pursuant to CPL 440.10." <u>Reed</u>, 115 A.D.3d at 1337 (citations omitted). Based on the record before this Court, petitioner has not filed a 440.10 motion on these points.[14] Therefore, these claims remain unexhausted.

Petitioner could still exhaust these claims, because there is no time limit within which an individual must bring a section 440.10 motion, and the statute does not prohibit successive applications. <u>See</u> N.Y. CRIM. PROC. LAW § 440.10(1) (stating that a motion to vacate may be made "[a]t any time after the entry of a judgment."). Federal district courts, however, have the discretion to dismiss unexhausted claims on the merits if the claims are "plainly meritless" or "patently frivolous." <u>Rhines v. Weber</u>, 544 U.S. 269, 277 (2005); <u>Mercedes v. Superintendent</u>, No. 9-12-CV-687 (DNH), 2014 WL 2711803, at *6 (N.D.N.Y. June 16, 2014); 28 U.S.C. §2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Accordingly, this Court has reviewed petitioner's unexhausted claims of ineffective

---

[14] Respondent notes that petitioner had filed two N.Y. CRIM. PROC. LAW § 440.10 motions while his state court appeal was pending, but did not raise these issues. Dkt. No. 13 at 15.

assistance of counsel and recommends that they be found plainly meritless. Petitioner was not prejudiced by counsel's failure to request a specific alibi charge, because the trial court's jury instructions conveyed the same underlying principles to the jury and the petitioner's counsel emphasized the alibi defense during his summation. Urena v. Lape, 715 F. Supp. 2d 325, 333-34 (E.D.N.Y. 2010) (collecting cases).

Petitioner was also not prejudiced by defense counsel's decision not to object to the admission of petitioner's sneakers as evidence. Petitioner's counsel had moved to suppress that evidence before trial as prejudicial, but the trial court withheld its decision until trial. Dkt. No. 12-1 at 133-35; Dkt. No. 12-5 at 189-91. When the evidence was introduced, petitioner did not object to its admission, choosing instead to emphasize the popularity of the shoe with the jury and argue that petitioner's ownership of a similar shoe was not proof that he was at the crime scene.[15] Dkt. No. 12-6 at 382-86. This was a reasonable strategy.

Likewise, petitioner has not shown that the decision not to subpoena Glenn Pendergraph to testify rises to the level of ineffective assistance. The decision not to call a particular witness is typically a question of trial strategy. Pierre v. Ercole, 560 Fed. App'x 81, 82-83 (2d Cir. 2014). Thus, the decision "whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation." United States v. Best, 219 F.3d 192, 201 (2d Cir.2000) (internal citations omitted). Petitioner has offered no evidence or theory that would rebut that presumption.[16]

---

[15] Petitioner challenged the admissibility of the sneakers on appeal, and the appellate division found that the fact that petitioner's sneakers were consistent with shoe prints left at the crime scene was evidence relevant to petitioner's guilt. Reed, 115 A.D.3d at 1336.

[16] The jury learned during Allen Ellis's cross-examination that Pendergraph was "in state prison because of killing someone who wouldn't return a gun to him." Dkt. No. 12-5 at 257, 295-296. A critical part of petitioner's defense strategy was challenging the credibility of prosecution witnesses Parnell and Ellis due to their criminal background. Dkt. No. 12-7 at 274-75. Even if Glenn Pendergraph offered exculpatory testimony, petitioner's counsel may have reasonably concluded that calling Pendergraph—a convicted

Petitioner's argument that his counsel erred by failing to "secure a private expert to analyze the DNA evidence" is factually inaccurate. The record shows that petitioner's counsel retained the services of a DNA expert and took several steps to ensure that the prosecutor provided all relevant data for independent analysis. Dkt. No. 12-4 at 28-38, 42. The record also shows that petitioner's counsel made the strategic decision not to introduce this expert testimony only after reviewing the expert's findings. Dkt. No. 12-4 at 88. Habeas relief is likewise unavailable based upon petitioner's patently frivolous argument that his counsel should have moved to suppress the Chicago White Sox cap that was found at the crime scene. See Verdel v. Cunningham, No. 07 Civ. 837(JGK), 2008 WL 2755833, at *7 (S.D.N.Y. July 14, 2008) (dismissing the petitioner's claim that trial counsel was ineffective in failing to request a suppression hearing where the evidence in question was lawfully obtained). Based on the above, this Court recommends that petitioner's unexhausted ineffective assistance of counsel claims be denied.

### III. Conclusion

For the reasons stated above, it is hereby:

1.     **RECOMMENDED** that Edward Reed's petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED**; and it is further

2.     **RECOMMENDED** that no certificate of appealability should be issued with respect to any of Reed's claims as Reed has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2). See 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial

---

murderer—as a witness would undermine that strategy.

of a constitutional right."); <u>see</u> <u>also</u> <u>Lucidore v. New York State Div. of</u> <u>Parole</u>, 209 F.3d 107, 112 (2d Cir. 2000).

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** <u>Roldan v. Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Small v. Sec'y of HHS</u>, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  May 24, 2017
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge